

# IN THE
# Court of Appeals of Indiana

Roger Dewayne Redding,

*Appellant-Defendant*

v.

State of Indiana,

*Appellee-Plaintiff*



**FILED**

Oct 03 2024, 8:47 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

---

October 3, 2024

Court of Appeals Case No.
23A-CR-3068

Appeal from the Madison Circuit Court

The Honorable David A. Happe, Judge

Trial Court Cause No.
48C04-2201-MR-133

---

**Opinion by Judge Brown**
Judges May and Pyle concur.

**Brown, Judge.**

[1] Roger Dewayne Redding appeals his conviction for murder. He claims the trial court abused its discretion in restricting his right to cross-examine Deputy Coroner John Smith ("Coroner Smith"). We affirm.

## Facts and Procedural History

[2] In 2020, Redding and Marina Redding ("Marina") were married. They had a tumultuous and volatile relationship depending on Redding's level of intoxication. At 9:08 p.m. on November 10, 2021, Marina called Patrice Dixon, Redding's cousin, and told her that Redding had accused her of sleeping with Dixon's son. Dixon did not believe there was any truth to the accusation. Marina placed the call on speaker, and Dixon could hear Redding's voice and aggressive tone and "start[ed] going off on him." Transcript Volume III at 94.

[3] At 9:30 p.m., Trevor Mullins, Redding's upstairs neighbor, had a conversation with Redding and believed Redding was "drunk as a skunk." *Id.* at 42. Mullins observed Redding and Marina arguing. At around 9:00 or 9:30 p.m., Dixon arrived at Marina's apartment and only Marina was present.

[4] During the evening of November 10 and the early hours of November 11, Marina and Redding exchanged text messages. At 12:27 a.m. on November 11, Marina sent Redding a message that said: "But u got me f----- up if you think your going to continue making me feel like a hoe!!! If you dont wanna be married to me.. then go!!! I have done nothing to be treated like this." Exhibits Volume I at 32 (capitalization omitted). At 12:28 a.m., she sent a

message that stated: "I refuse to continue the verbal abuse that Im always f------!!!" *Id.* (capitalization omitted). At 12:52 a.m., Marina sent a message saying that Redding was heartless. A later examination of Marina's cell phone revealed that the last activity that required user input occurred at 1:50 a.m. on November 11.

[5] After leaving the apartment, Redding drank alcohol, smoked cocaine, and returned to the apartment at 7:35 a.m. for about four minutes and forty seconds. At some point, Anna Mason, Marina's neighbor, heard a scream.[1]

[6] On November 11, 2021, two ATM withdrawals totaling approximately $300 occurred from Marina's account with Madison County Federal Credit Union. That same day, Marina's daughter, Kira Smith ("Kira") tried to reach Marina but was unsuccessful.

[7] At 8:15 p.m. on November 11, Hamilton County Sheriff's Deputy Skyler Moe arrived at a scene involving a vehicle accident and observed a vehicle, later identified as belonging to Marina, with "extreme damage to all sides of the vehicle" in the middle of a cornfield. Transcript Volume II at 59. Approximately 500 to 700 feet from the vehicle, other law enforcement officers

---

[1] When asked how late she and her friends were partying that night, Mason answered: "Um, pretty late. Um, till early morning hours. Um, anywhere between midnight to seven (7), eight (8) in the morning. We might've stopped drinking before that but that's when we were up and all hanging out." Transcript Volume III at 63. Redding's counsel asked: "Okay, and in relation when would've you heard the scream? Was it in the middle of that?" *Id.* Mason answered: "Um, yes. So somewhere in the middle of that. Probably like – I don't know – late. Like, um, I can't put an exact timeframe on them, but it could've been between – anywhere between midnight, maybe four (4), five (5) a.m." *Id.*

found Redding hiding in bushes under a tree and suffering from a "large gash" on his abdomen. *Id.* at 66. Redding was "very quiet," "seemed kind of out of it," and had slurred speech. *Id.* at 72. Law enforcement later discovered Marina's wallet, driver's license, and her ATM card for Madison County Federal Credit Union in the vehicle.

[8] Deputy Moe called Kira and informed her that Marina's vehicle had been involved in a wreck and asked her if she knew Marina's location. Kira went to Marina's apartment, observed through a window that Marina's purse was in the living room, and knew "right then and there something was majorly wrong." *Id.* at 91. Kira tried to open the door, but it was locked. She spoke to the landlord, Darryl Rensel, who went to Marina's apartment, unlocked the exterior door to the building, unlocked the door to the apartment, returned from Marina's apartment, and said: "Don't go over there. I need my phone to call 911." *Id.* at 94. Kira ran to Marina's apartment and found Marina in her bedroom lying on the bed face down, there was blood, and Marina's body was cold.

[9] Law enforcement responded to the apartment at about 11:58 p.m., did not notice any signs of forced entry into the apartment, and discovered a knife with blood and a cell phone near Marina's body. Coroner Smith placed paper bags over Marina's hands to prevent them from touching other items.

[10] At about 5:00 a.m. on November 12, 2021, Anderson Police Detective Scott Sanderson spoke with Redding who was in the hospital. Redding said that he

had an argument with Marina at the residence and he then left. Law enforcement canvassed the area around the apartment, located a camera one block east of the street on which the apartment was located, and obtained surveillance video.

[11] Later that day, Norman Rayford, Jr., the Assistant Chief for Operations for the Anderson Police Department, interviewed Redding. Redding stated that he crashed into "[n]othing" and he was "[j]ust riding" before the crash in the cornfield. Transcript Volume IV at 39. When asked where he had stayed all night, he said he was at Oscar Malone's residence. Rayford told Redding that Marina had been stabbed to death, and Redding said, "B---sh--," and did not display any type of emotional reaction. *Id.* at 59.

[12] On November 15, 2021, the police interviewed Malone who indicated that he had not seen Redding in "a long time."[2] Transcript Volume III at 9. Dr. Latanja Watkins, a forensic pathologist, conducted an autopsy on November 15 and determined that Marina died as a result of "[m]ultiple stabs and incised wounds." *Id.* at 78.

[13] On January 18, 2022, the State charged Redding with murder and alleged that he was an habitual offender. On August 21, 2023, the court began a jury trial at

[2] On redirect examination, Malone indicated that a long time "don't mean a month, a year or nothing like that. I mean that just mean I hadn't seen him [in] awhile. Pretty sure that's what I meant by it." Transcript Volume III at 12.

which Coroner Smith testified. The jury was unable to reach a unanimous decision, and the court declared a mistrial.[3]

[14] Prior to the commencement of a second jury trial, the State filed a motion in limine on October 17, 2023, requesting that the court order the defense counsel and defense witnesses not to mention "[t]estimony from [Coroner Smith] regarding his opinion of Marina Redding's time of death." Appellant's Appendix Volume II at 146 (citing Ind. Evidence Rules 701 and 702).

[15] Redding's counsel argued that Coroner Smith was not a lay witness and was "able to form some sort of degree of opinion . . . based upon his training and experiences as a deputy coroner." Transcript Volume II at 28. He asserted that limiting the ability to ask him questions restricted Redding's ability to present a defense and his constitutional rights. The prosecutor argued that Coroner Smith had told him in a pretrial meeting that he was unqualified to testify about time of death and had maintained that since the first trial. The court granted the State's motion in limine.

[16] During Coroner Smith's testimony at trial, he indicated that he had been the Madison County Deputy Coroner since January 2021 and he investigates deaths, which required a forty-hour course. When asked about his experience prior to becoming a deputy coroner, he stated that he was a paramedic and a firefighter for about thirty years. He indicated that he responded to the death

---

[3] The record does not contain a transcript of the first trial.

investigation in the early morning.[4]  He described livor mortis as the pooling of blood "in generally dependent areas . . . of the body after death."  *Id.* at 163.  He testified that livor mortis appears "[d]epending upon . . . the length of time, . . . it goes from a purple pinkish reddish color to a dark red.  The longer the time the darker the color."  *Id.* at 163-164.  He indicated that he observed livor mortis in Marina's body and that rigor mortis, the stiffening of joints in the body, was also present in Marina's body.

[17]  After direct examination, Redding's counsel requested a hearing outside the presence of the jury for an offer of proof.  Redding's counsel argued that "the State has brought rigor mortis and the training and everything so I think that's been open at this point . . . ."  *Id.* at 168.  During the offer of proof, Coroner Smith stated that he indicated that the rigor mortis was a "plus two" in his report which was "just a personal scale that [he] use[s] to help [him] remember . . . how stiff the rigor mortis was."  *Id.* at 169.  When asked if that scale could give him an indication of how long someone had been deceased, he answered: "No.  No, that's something I'm not qualified in."  *Id.* at 170.  The following exchange then occurred:

> Q  Do you recall your testimony from the last trial?

---

[4] Coroner Smith testified that he responded to the death investigation in the early morning hours of November 11, 2021.  The State notes that "[i]t can be assumed that he means the early morning hours of November 12, 2021, since he arrived after law enforcement, and two officers were the first ones at the scene on 11:58 p.m. on November 11, 2021."  Appellee's Brief at 11 n.1 (citing Transcript Volume II 151, 154, 162-163).

A  Yes.

Q  Did you say something different in the last trial?

A  I did.

Q  Okay.  Pretty curious of why you would say something different in your last trial and now all of a sudden it's a completely different story.

A  I was under a lot of stress.  I felt compelled to give an answer.

Q  So when you said last time as [sic] trial the time of death based upon science it – in your experience the time of death was between eight (8) to twelve (12) hours prior to eleven-thirty (11:30) p.m. on 11/11 of 2021.  That was flat out wrong?

A  I don't believe I used the word science.

Q  Okay.

A  I'm not qualified to give that opinion.

Q  You were qualified at the last trial, right?

A  No sir, I was not.

\* \* \* \* \*

Q  [W]hat changed your mind in you decide [sic] now that you're not qualified, but previously you were qualified enough that you were able to answer the question?

A  Um, not sure I can answer that.

Q  [W]as it some conversation with the State of Indiana in regards to that?

A  No.

\* \* \* \* \*

> Q  What changed your mind from the last trail [sic] whether –
> because you were willing to answer at the last trial, now your
> [sic] saying I can't answer that question because I'm not
> qualified.  What changed your mind?
>
> A  Just had time to think about it and, um, again I just felt
> pressured to give a respond [sic] to your question and I shouldn't
> have.

*Id.* at 170-172.

[18]   Redding's counsel argued that he "should be able to ask him all that," "[w]hy he said that at the last trial," and that "it's open for impeachment and . . . it's open for factual information in front of the jury and I believe I should be able to go beyond the scope of the Motion of [sic] Limine in regards to that." *Id.* at 173.  Upon questioning by the prosecutor, Coroner Smith indicated that he met with prosecutors before the previous trial and told them that he was not qualified to testify regarding the time of death and he reiterated that in a meeting "within the last couple weeks." *Id.* at 174.  When asked if he ever determines a time of death in the course of his employment, he answered: "No, I do not." *Id.* at 175.  Defense counsel asked: "[B]ased upon science and experience, can you give any range of time based upon rigor mortis?  Can it tell you how long somebody's been deceased based upon that science, any range?" *Id.*  Coroner Smith answered: "I'm just not qualified.  I don't have enough experience.  I don't have enough knowledge to make that determination." *Id.* The court concluded that the order in limine would remain in place.

[19] After the jury returned, Redding's counsel asked Coroner Smith if he was able to determine a time of death. Coroner Smith answered: "Beyond the official time and, um, made by the first responders, no." *Id.* at 177. When asked if he had any training or experience that allowed him "to determine a death based upon [his] observations of the individual . . . when" he arrives, he answered in the negative. *Id.* During a bench conference, Redding's counsel indicated that he was going to ask Coroner Smith if he had previously testified to an approximate time of death and argued that such a question did not violate the order in limine. The prosecutor objected. When the prosecutor asked about the relevance, Redding's counsel asserted that "[i]t's impeachment." *Id.* at 178. After some discussion, the court sustained the prosecutor's objection, stated that it would not allow defense counsel to ask that question, and stated that defense counsel would be allowed an opportunity to make "an Offer to Prove as to what your question would have been and his answer." *Id.* at 182.

[20] Outside the presence of the jury, Redding's counsel made the following offer of proof:

> Q [A]t the previous hearing you testified to an approximate time of death based upon what you observed, is that correct?
>
> A I did.
>
> Q Today you're saying that you're not qualified to do that?
>
> A That's correct.
>
> Q At the time of the previous hearing did you believe that you were qualified to do that?

A  I don't know.  Um, again, I felt pressured.  I felt compelled to give a response.

Q  So you just don't know if you were qualified at the previous hearing?  You don't know what you – if you believed you were qualified?

A  No.

*Id.* at 184-185.

[21]  The prosecutor argued that "in the first trial [Coroner Smith] testified to an approximate time of death" and "he never testified about his qualifications" and "his testimony now that he's not actually qualified to make that determination is not inconsistent."  *Id.* at 185.  The court stated:

> The Court is going to find that it's . . . debatable whether or not this is in fact an inconsistency that would demonstrate.  But more over [sic] the Court is going to find under 403, that the relatively slight tendency that could exist to impeach the witness is very strongly outweigh[ed] by the risk of prejudice to the State or confusion among the jurors as what the purpose of the testimony would be.  I think it's very likely that they would interpret that as evidence of the time of death which it is not competent to, uh – uh, be considered by them for that purpose.

*Id.* at 186.

[22]  The State presented the testimony of multiple witnesses including Deputy Moe, Kira, Rensel, Detective Sanderson, Malone, Redding's neighbors, Dixon, Dr. Watkins, and Scott Grammer, an employee of the Indiana State Police Laboratory.  Dr. Watkins testified that she conducted an autopsy of Marina and

noticed visible lividity as well as rigor mortis. When asked if she determined time of death as a forensic pathologist, she answered: "Um, usually I refer – it's not a specific science to determine a . . . time of death from an autopsy examination. Um, usually the best measure to determine the last time somebody, um, was alive was the last time they were seen alive or there was contact or things of that nature." Transcript Volume III at 71-72.

[23] When asked about the bag placed on the outside of Marina's right hand, Grammer testified that blood was indicated by presumptive testing and the DNA profile obtained was interpreted as a mixture of two individuals with a major and a minor contributor. He also stated:

> The major profile was consistent with Marina Redding who is assumed as a contributor since it came directly off of her body. Roger Redding could not be excluded as a contributor to that minor contributor, and it was determined that the DNA profile is thirty-four (34) million times more likely that if it originated from Marina Redding and Roger Redding than if it originated from Marina Redding and an unknown, unrelated individual. This statistical analysis provides very strong support for the inclusion of Roger Redding.

*Id.* at 240-241.

[24] After the State rested, Redding testified that his arguments with Marina were predominantly about his drinking and he accused Marina of sleeping with Dixon's son because he "was drunk" and "talking crazy." Transcript Volume IV at 99. He indicated that he "went all over town drinking" and smoked cocaine after he left the apartment on the night of November 10, 2021. *Id.* at

101. He indicated that he lost his cell phone "[r]ight after 1:08, apparently," and went to Malone's residence "later on" and smoked cocaine until 6:30 or 7:00 a.m. *Id.* at 105, 107. He indicated that he returned to Marina's apartment at 7:35 a.m. to "get some money and the car" and unlocked the door. *Id.* at 109. He acknowledged that the neighbor's surveillance video showed that he was in the apartment for about four minutes and forty seconds. He indicated that he took Marina's keys and wallet from her purse, obtained marijuana from his "weed drawer," and left to purchase drugs. *Id.* at 136. On cross-examination, the following exchange occurred:

> Q And you're saying that all you did in that four (4) and a half minutes, where we can tell that you're in the house, is grab the weed and grab two (2) items from her purse that were in a single room. Is that what you're saying?
>
> A I got my marijuana. I mean what else can I tell you. I grabbed my marijuana, grabbed the keys, I grabbed the purse.

*Id.* at 137. The court later asked a juror's question of: "What door had the purse, bedroom or front door?" *Id.* at 143. Redding answered: "Front door." *Id.* The jury found Redding guilty of murder, and Redding admitted that he was an habitual offender.

## Discussion

[25] Redding argues that the trial court abused its discretion in restricting his right to cross-examine Coroner Smith and asserts that he was entitled to impeach him with his testimony from the first trial. Generally, we review the trial court's

ruling on the admission or exclusion of evidence for an abuse of discretion. *Roche v. State*, 690 N.E.2d 1115, 1134 (Ind. 1997), *reh'g denied*. We reverse only where the decision is clearly against the logic and effect of the facts and circumstances. *Joyner v. State*, 678 N.E.2d 386, 390 (Ind. 1997), *reh'g denied*.

[26] Ind. Evidence Rule 613 is titled "Witness's Prior Statement" and subsection (b) provides: "Extrinsic evidence of a witness's prior inconsistent statement is admissible only if the witness is given an opportunity to explain or deny the statement and an adverse party is given an opportunity to examine the witness about it, or if justice so requires." Ind. Evidence Rule 401 provides that "[e]vidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Ind. Evidence Rule 403 provides: "The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence." "All evidence that is relevant to a criminal prosecution is inherently prejudicial, and thus the Evidence Rule 403 inquiry boils down to a balance of the probative value of the proffered evidence against the likely unfair prejudicial value of that evidence." *Hendricks v. State*, 162 N.E.3d 1123, 1134 (Ind. Ct. App. 2021), *reh'g denied*, *trans. denied*. The balancing of the probative value against the danger of unfair prejudice must be determined with reference to the issue to be proved by the evidence. *Id.*

[27] The State acknowledges that Coroner Smith had testified at the first trial about the relationship between Marina's time of death and the onset of rigor mortis. After the first trial ended in a mistrial, the State filed a motion in limine to prevent any mention of Coroner Smith's prior testimony regarding his opinion of the time of Marina's death. This is likely because Coroner Smith's prior testimony would be contradicted by the testimony of Dr. Watkins, the forensic pathologist, who stated that determining a time of death is "not a specific science" and "usually the best measure to determine the last time somebody, um, was alive was the last time they were seen alive or there was contact or things of that nature." Transcript Volume III at 71-72. During the offer of proof, Coroner Smith stated that he indicated that the rigor mortis was a "plus two" in his report which was "just a personal scale that [he] use[s] to help [him] remember . . . how stiff the rigor mortis was." Transcript Volume II at 169. Coroner Smith's prior testimony bears on his credibility and competence. Accordingly, we find Coroner Smith's prior testimony to be relevant and that the trial court abused its discretion in restricting the cross-examination of Coroner Smith.

[28] A trial court's error in excluding evidence does not require reversal if the error was harmless. *Hayko v. State*, 211 N.E.3d 483, 491 (Ind. 2023), *reh'g denied*, *cert. denied*, 144 S. Ct. 570 (2024). For non-constitutional errors, our harmless-error analysis is found in Appellate Rule 66(A). *Id.* Ind. Appellate Rule 66(A) provides:

No error or defect in any ruling or order or in anything done or omitted by the trial court or by any of the parties is ground for granting relief or reversal on appeal where its probable impact, in light of all the evidence in the case, is sufficiently minor so as not to affect the substantial rights of the parties.[5]

[29]    The Indiana Supreme Court held:

When an appellate court must determine whether a non-constitutional error is harmless, Rule 66(A)'s "probable impact test" controls. Under this test, the party seeking relief bears the burden of demonstrating how, in light of all the evidence in the case, the error's probable impact undermines confidence in the outcome of the proceeding below. *See Mason v. State*, 689 N.E.2d 1233, 1236-37 (Ind. 1997); [Edward W. Najam, Jr. & Jonathan B. Warner, *Indiana's Probable-Impact Test for Reversible Error*, 55 IND. L. REV. 27, 50-51 (2022)]. Importantly, this is not a review for the sufficiency of the remaining evidence; it is a review of what was presented to the trier of fact compared to what should have been presented. And when conducting that review, we consider the likely impact of the improperly admitted or excluded evidence on a reasonable, average jury in light of all the evidence in the case. *See Tunstall v. Manning*, 124 N.E.3d 1193, 1200 (Ind. 2019). Ultimately, the error's probable impact is sufficiently minor when—considering the entire record—our confidence in the outcome is not undermined.

*Hayko*, 211 N.E.3d at 492.

---

[5] On appeal, Redding uses similar language to Ind. Appellate Rule 66 and asserts that "[e]rrors in the admission of evidence are considered harmless unless they affect the substantial rights of a party." Appellant's Brief at 10.

[30] The record reveals that Redding used an aggressive tone with Marina on November 10, 2021. A neighbor observed Redding and Marina arguing. Redding and Marina exchanged heated text messages during the evening of November 10 and the early hours of November 11. After leaving the apartment, Redding drank alcohol, smoked cocaine, and returned to the apartment at 7:35 a.m. Redding acknowledged that a neighbor's surveillance video showed that he was in the apartment for about four minutes and forty seconds. On November 11, 2021, two ATM withdrawals totaling approximately $300 occurred from Marina's account with Madison County Federal Credit Union. That same day, Kira tried to reach Marina but was unsuccessful. Law enforcement officers discovered Redding hiding in bushes and Marina's damaged vehicle in a cornfield. Law enforcement also discovered Marina's wallet, driver's license, and her ATM card in the vehicle.

[31] Despite Redding's statements that he was at Malone's residence that night, Malone indicated on November 15, 2021, that he had not seen Redding in "a long time." Transcript Volume III at 9. When asked about the bag placed on the outside of Marina's right hand, Grammer testified that blood was indicated by presumptive testing and the DNA profile obtained was interpreted as a mixture of two individuals with a major and a minor contributor and that "the DNA profile is thirty-four (34) million times more likely that if it originated from Marina Redding and Roger Redding than if it originated from Marina Redding and an unknown, unrelated individual." *Id.* at 240-241. Kira testified that Marina's back "was cold" and she "knew [Marina] had been gone for a

while." Transcript Volume II at 95. Rensel, the landlord, testified that Marina's legs "had started turning black from the – I guess from the blood pool" when he found her body. *Id.* at 129. He also stated: "When I'd seen her legs I knew she'd been there for a – quite some time." *Id.* at 132. In light of the record, we conclude any error was at most harmless. *See Hayko*, 211 N.E.3d at 494 ("Hayko has not shown, considering all the evidence before the jury, that the excluded opinion testimony would have impacted a reasonable, average jury to such an extent that undermines our confidence in the verdict. The error is therefore harmless.").

[32] For the foregoing reasons, we affirm Redding's conviction.

[33] Affirmed.

May, J., and Pyle, J., concur.

ATTORNEY FOR APPELLANT

Frederick Vaiana
Voyles Vaiana Lukemeyer Baldwin & Webb
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Theodore E. Rokita
Attorney General of Indiana

Catherine Brizzi
Deputy Attorney General
Indianapolis, Indiana